Good morning. May it please the Honorable Court, Gerald Sawyer appearing on behalf of the Appellants and Cross-Appellees, Charter Asset Management Fund, L.P., Charter Asset Management Fund, G.P., L.L.C., and David Park and Paul M. I want to start with a quick overview for you to lend perspective to this case. The importance of the overview is as follows. The trial that I ended up acting the lead in wasn't a copyright case, but actually what it was was more akin to a trade secret, unfair competition case. Those claims had originally been brought by CSC and were dropped. When you consider that and you look at the issues, it adds context to what we were confronted with at the trial. The first set of issues, and by the way, sorry, I want to reserve five minutes if I didn't say that. The first issue that we dealt with in our brief was the dealt with in a copyright case, you must show ownership of the copyright. What happened at the trial is that you had, and when I say it's unfair competition and trade secrets, you had the OREC law firm for the first time in their history assigning their work product to the client and Latham Watkins then was trial counsel and brought the case. The case was to eliminate the competition from my clients. Now, when you look at what went on at the trial in terms of the first basic thing of copyright law, establishing ownership of the copyright, what happened was they had two copyright filings and, again, I had used a simple graphic demonstrative for the jury to try and understand it. What happened is as follows. They copyrighted, and we'll get to the assignment in a second, they copyright what they call the 2013 blank forms. When you look at the exhibit on the application and you look at the forms, you'll see 2013 in them. When you look at the assignment, it talks about blank forms. They also had something called the 2012 financing documents. At trial, nothing was attached. So what I was confronted with and tried to explain to the jury and then the district court was the following. Number one, they had not proven an ownership in the copyright that at trial the evidence was geared to. And the evidence, I have multiple copies if you can see it, but basically the concept was the following. The entire trial, based on, again, what they thought was trade secrets and unfair competition, was that Mr. M had worked for Academia Avance and Mr. M had access at that school to what was the form utilized by CSC. Throughout the trial, what they did is they used the Avance purchase agreement and then they tried to show, uh-huh, the Curtin-McConkie form, and we'll get to that, and this is the one that they used. Curtin-McConkie was the law firm from Utah that my clients went to after using a bare bones agreement that they called the legal zone to test it for the business. And again, this business is factoring. It's been around for hundreds and hundreds of years. There's no magic to it. It's done every day. But what happens, to get back on point, is that they looked at forms, a couple forms that my client had utilized, no expert testimony, and they consistently said, uh-huh, here's a phrase, here's a word, here's something from the Curtin-McConkie form, always pointing to the Academia Avance form. Never once, never once did they pull out the 2013 blank form agreements and say, this is where we have substantial similarity. Here's where we have copying. And we worked through in our brief in terms of, well, how could they possibly save themselves? With respect to the assignment, there was no assignment of the 2012 Avance agreement. So then I looked at the issue, well, maybe derivative. Maybe they can, a derivative work. The problem is, is when you look at the record, the Avance form in 2012 is not derivative of the 2013 form. And in fact, when we look at the filings, they don't reference anything having to do with the derivative work. They basically, and again, the filings talk about that it is original, compilation and text. And they failed. They failed at trial to establish, again, that they owned the copyright in the form, the legal form, that they claimed had been infringed upon. They did not even draw a nexus. How about now it's attenuated. Let's take the 2012, show how it flows into the 2013 blank forms, and then we have the Avance agreement. Show how it ties into the forms that my clients were using that had been drafted by counsel in Utah. That wasn't done. So your main argument is that there was insufficient evidence, I believe. Is that right, to prove copyright infringement? I believe ownership of the copyright. That is one of the arguments that we have. That's not, when you say main, I believe there are others that are just as important, at least in my mind, when we get to some other items. I guess what I wanted to ask is why couldn't the jury have found that the RPAs were just versions of the generic form? And my answer to you is that the following. We're not talking about a couple paragraphs on a page. They did not have access to a red line program. It is virtually, when we're talking about 50 pages, I mean that it would be very difficult for them to try and key in and do the, quote, unquote, I'll get to a side-by-side comparison. The jury was left without a rudder. They did not have the ability, based on the admission of the evidence, to properly do their job. The evidence let them down in terms of they did not have, and again, you'd have to get at were they copying the 2013 form. That's the whole point. I get it. Let's, if you said it was maybe a couple of drawings and we could eyeball a couple of drawings, this is far more complex. And you understand the deference here that we have to give to the jury is very high. I understand. But I think in this place it's a de novo review. And I believe that. Why would it be a de novo? I think I may have missed that. Why is it a de novo review? Because under this one, in terms of we had cited to, with respect to the denial of our motion for judgment as a matter of law, we made a motion for judgment. Okay. So I believe that you have more authority on this than simply abuse of discretion. And with respect, you get to take a hard look at what went on. So that to me, number one, on something so basic under the statute, when I get to, you've got to show the ownership. And you look at any testimony, when you look at the form that now we're talking again, OREC and Latham Watkins, they draft a form and they don't include in the assignment anything having to do with the Avanse agreement. But the assignment agreement specifically says that the 2013 form RPA was periodically revised by CSC and OREC over time. And I guess my question for you is doesn't that show that the assignment agreement was intended to encompass all of the various versions of the RPA that CSC and OREC worked on? And I would say no, because then you're talking about a derivative work. Those forms preceded, and look at the filing. They said that the 2013 form is original. They did not cite to that it's a derivative work of other forms that preceded it. You have to move forward in time. And did you make this argument to the jury? Did you make that argument? I did. That's why, I mean, I don't mind. I had copies for you. But my graphic is what I tried to use to explain to the jury, under this complex scenario, what was going on, that they had not met their burden of proof. Now, you say, you explained it, and that's where I dovetail into the other issues, because the context issue is as follows. When we get to the other set of issues, now, this is abuse of discretion. When we get to the issue of Curtin-McConkie, and again, the issue, I don't know if I was opening doors or falling through trap doors at trial, but what went on is the following. Curtin-McConkie was embedded in the case because there was a claim of vicarious or contributory infringement. I could not put on my case without uttering the words, Curtin-McConkie or Joel Wright. And when you look at the record, as soon as I uttered those words in my opening, that's when things began to unravel with respect to ultimately at the trial, not only that we had sued them, and again, I was not the original counsel on this. When I came in and saw that you had a third-party complaint against your lawyers, the plaintiff could sit back and watch the shooting match. I wasn't about to be a party to that. I was able to get that done, and I only came in about two and a half months before the trial. I got rid of Curtin-McConkie. I tried to explain to the district court how important it was not to have him in, and lo and behold, what happens? Not only that we sued him, but we had dismissed him. Then I have to put up no money changes hands, and then in the closing argument, what do I get hit with? That my clients aren't going to pay a penny, because what's going to happen, it's going to come out of Curtin-McConkie. So that's an overlay when you're trying to explain what's going on. It goes further. When I get to the issue of the Supreme Court case of Feist, Sweat of the Brow, I tried desperately that copyright infringement, and under polar bear, the damages are tied to, in this case, basically, the indirect profits, because we're not selling them. The indirect profits are attributable to a form. Again, I made the arguments, I mean, legal forms in terms of people getting them with their credit cards or a car rental company, that that is not something that people look at, wow, now I want to do this. But the point of it all was, was that under the Supreme Court decision, you can't talk about how little or how much effort, time, and money you spent in developing the copyrighted work. Instead, that's what I got hit with. Oh, hundreds of thousands of dollars, Doric, I apologize. I just want to, you have limited time, and there's a number of questions I want to ask you regarding your evidentiary arguments and the malpractice suit reference and the amount of legal fees paid by CSE and CAM. Can you specifically explain how the evidence prejudiced your clients and provide for support? Absolutely. They called my clients, the point was, free riders. When that evidence comes in about what you spent on the legal fees, that then is, oh, you didn't spend as much. It takes you away. The prejudice is, is that is something then is in the jury's mind that is prejudicial to my clients, because the jury now is inflamed that they're saying, ah-ha, these guys spent hundreds of thousands of dollars on this form, and based on that, wow, you guys are using the form, and that's not the correct analysis. That, I couldn't unring that bell if I tried at that point. When you look at, think about the two issues here on the abuse's discretion. Curtin-McConkie, these guys aren't going to pay a penny, because their former lawyers are on the hook, number one. And then number two, oh, gee, they spent all this money on this form, and so they're not going to pay a penny. The jury then is driven, because that then ties to, as I said, may I grab some water? I apologize. That ties to when we look at what's happened with the district court. We get instructions at 10 p.m. on Sunday night. We come in, and all of a sudden the district court, even though no one asked for it, we have two instructions. The two instructions that we pointed out in our brief, the district court. The district court, I believe, if you're talking about the malpractice suit reference, gave warnings to Kim about opening the door by presenting, you know, other arguably equally irrelevant evidence about why the infringement was Curtin's fault. There was no evidence. We didn't elicit anything. As a matter of fact, I was very careful. What happened was on cross, they were trying to pull that out of my clients. But there is nothing in the record that what we were doing, and again, you have the vicarious liability and contributory. The case wasn't tried about an empty chair. You can go through the entire record. That's not what went on. The Curtin-McConkie issue, they brought them in. They didn't sue them. They want to establish liability through Curtin-McConkie as a fallback position against my clients. I cannot not mention them. It's not like Harry Potter, Voldemort, don't say the word. So what I did was, yes, that's embedded in the facts. Curtin-McConkie was retained. Curtin-McConkie got a form from another firm called Kutak Rock. It had no mention of CSC on it. Curtin-McConkie advised my clients that no problem with using the form because of the sunshine laws. It's a public document. No analysis. Again, we didn't get into malpractice, but Curtin-McConkie was embedded in the case. So the other side should have been able to make inquiry about it. They were embedded in the case. Then isn't it fair game to explore everything regarding the firm? Absolutely not. What relevance does it show that we sued our former lawyers, whether we had sued them or dismissed them or got any money out of them? The jury wouldn't even find that out. If we had a judgment and somehow there was some offset, that would be for the court. Well, that's an implication that they perhaps copied the documents. Copied, again, let's be clear, copied a form. The evidence was that they copied a form that came to them from another firm called Kutak Rock. But isn't the jury entitled to sort all of that out, to make those distinctions? I think that the jury was inflamed. My belief is that what I was trying again, and we get to it when you see they awarded 100 percent of every profit my clients made from the beginning when they started using the alleged infringing form up until they That's why I say the overview. That's why I say everything is tied together. The jury instructions that I was getting at is that the court, no one asked for it, it's not in the model jury rules, said all of a sudden, you've got to do a side-by-side comparison. Now, I don't disagree with that. Excuse me. The Ninth Circuit model instructions do state that the court should craft instructions on substantial similarity based on the particular works at issue, the copywriting question, and the evidence developed at trial. So they give permission to the court to deviate or expand on the model instructions. No question. My issue was you give it to me at 10, you've sat through the trial as a district court judge. You're also looking at what the evidence is. You give me an instruction on a side-by-side at 10 p.m. No ability then, what should I do in the defense? How am I going to react to that? You read it early in the morning or late at night and then you object. There's a lot of pressure. I was closing that day. There was a lot going on. I understand I'm not going to cry here. I mean, I'm not making excuses. If that was allowed to be a reason to overturn somebody's verdict, then we'd be overturning verdicts all the time. If people were tired during trial. I didn't mean it that way. This is of the issues, I would put this one as the, it is an issue. I'm not saying that it is the most important issue. But what about joint authorship? Both sides said they didn't want an instruction on joint authorship, and yet it was put into the case. I'm still having trouble how that instruction prejudiced your clients, too. Can you point to anything in the record showing that the jury actually relied on that instruction? Did CSC rely on the joint authorship theory in closing argument? They did not, but because it was in there, it might have overcome the issue of the lack of, they would have overridden the copyright application filings and the assignment. So the question I would like to ask you about, before your time goes up, is over, is, regarding the profits. Under the Copyright Act, the jury was allowed to award all of Cam's profits. If Cam failed to prove that some of the profits were attributable to factors other than the infringement. So I was just hoping you could explain to me what evidence. Yes. Let me finish, please. What evidence Cam presented at trial that clearly proved that other factors caused the profits. Yes. The way the process works is you negotiate up front what the deal is. So we're willing to give you $100,000, explain the factoring that of that 110, I'm just making up numbers, 110,000 on the receivable will come in. We're going to get the 110. It's all explained up front. Then it's documented. So what does that go to? My clients talked about their marketing, their personal service that CSC did not give, their negotiations, how they handled the schools, all of these things. To say that a legal form is, that's the infringement of a legal form, that that is what 100% of the profits are based on, we're elevating our profession to someplace that it doesn't belong when we talk about protection of the science and arts. What evidence did Cam present, I'm not sure you answered my question, what evidence did Cam present at trial that clearly proved that there were other factors? I just gave it to you, it's all in the record. How the deal is done, what they did in terms of marketing, how they approached the schools, what they were offering in terms of the service component. The personal touch, and what you had was a little guy versus, we put on evidence from one of the teachers that said the form was meaningless to me. Okay? That was after the fact. That's what we put on in terms of evidence. So I don't believe a form, and by the way, what's that form, if you want to know the heart of it, I'll give it to you. It's all about the true sale doctrine, they said, the magic of how do we avoid the bankruptcy court if the school goes belly up, that they don't claw back. And I would say to you, oh, if Cam got profits because of that true sale doctrine, then I would see a nexus. There was no evidence of that. None. So, and I haven't touched on, can I reserve or is there anything else? You're over your time. We'll give you a couple minutes for rebuttal, but you've exceeded your time. Thank you.  Good morning, may it please the court. I'm Jamie Sprague, counselor for the Appalachian Cross Appellate Charter School Capital, or CSC. It's only morning for another two minutes. I want to start by addressing an argument that was emphasized in Cam's brief, and again, at argument just now, and that was that there was no evidence in the record to support a finding that CSC owned and registered a copyright in the Avanse agreement. The record is to the contrary. The Avanse agreement was in evidence. The application that CSC submitted to the Copyright Office for the Avanse agreement was in evidence. And the registration certificate, which CSC received back from the Copyright Office, was in evidence. And CSC's general counsel, Ms. Carrie Giovanni, testified that she authenticated the copyright application and testified specifically that it related to the Avanse agreement, which of course was also in evidence. In effect, her testimony was the staple that held those three exhibits together. And although this isn't the only evidence that supports the jury's verdict, this alone is enough, because a copyright registration creates a prima facie case that the plaintiff both owned and registered the copyright at issue. Cam doesn't point to any evidence that contradicts this finding. Instead, their argument rests on the fact that the registration and application documents call the copyrighted work the 2012 financing agreement instead of the quote Avanse agreement. Of course, this is exactly what the Avanse agreement was. It was a financing document from 2012. So rather than contradict the evidence at trial, this just supports the evidence that CSC both owned and registered the Avanse agreement. Although the registration document is sufficient on its own for the jury to find both ownership and registration, there was also direct evidence at trial that CSC owned the Avanse agreement. The assignment agreement between CSC and OERC was in evidence, and the two individuals who, two lawyers who helped negotiate that agreement both testified that the intent of that agreement was to transfer both the Avanse agreement and the 2013 forum agreement to CSC. They know better than anyone, and certainly better than Cam, who's an outsider to that agreement, what the document means, and there was no evidence in the record to the contrary. Additionally, CSC presented evidence that whereby the jury could have found that Cam infringed the 2013 forum agreement. The jury was properly instructed, as I'll get to in a minute, to conduct a side-by-side analysis of the copyrighted work and the infringing work. And even putting that aside, there was evidence from CSC's general counsel, Ms. Giovanni, that she had performed that comparison and found that the infringing documents were, quote, copied and pasted wholesale from the forum agreement. Can I ask you some questions that I have for you? What was the relevance of evidence regarding Cam's malpractice suit against Curtin? Given the copyright infringement is a strict liability offense, I don't see how the malpractice claim at all tends to prove any fact an issue. And it seems like the evidence could have been prejudicial to Cam because you argued to the jury that Cam would not end up paying the judgment against it. So can you explain to me why this evidence was admissible and why you think there was no prejudice? Sure. So the trial court initially agreed with Your Honor that this evidence was not relevant to the case and cautioned Cam at that time that if they intended to pursue a strategy of blaming their lawyers, not just mentioning that their lawyers were the ones that drafted the form, but blaming their lawyers, that the door would be open at that point. Because blaming the lawyers leads the jury to, it confuses the jury into thinking that they can't award against Cam because they are innocent infringers. But there is no innocent infringement defense to a copyright claim. And in fact, to help clear up this issue, CSC also requested a jury instruction on innocent infringement, which the trial court declined to give. And we just heard an oral argument that all that happened was that Curtin-McConkie was mentioned. And this is belied by the record. In opening, Cam argued that their own lawyer had told them it's not improper to use the form. And they argued they had a right to rely on an attorney, and they did so. Then they went on in testimony for hours, as the trial court properly noted. They spent an inordinate amount of time blaming their lawyers, saying over and over again that they never gave the RPA to their lawyers, that Curtin-McConkie had advised them it was legal to use the form, that they never copied anything, that they would have never done any of this if Curtin-McConkie didn't tell them it was okay to do that. Testimony was that it's actually crazy that we are here because of advice we got from a lawyer that we trusted. So as the trial court noted, this was a main trial strategy of Cam, and it was sowing a lot of confusion in the minds of the jurors about whether they were in fact permitted to award damages against an innocent infringer. The questioning that CSC pursued after the trial court determined that the door had been opened was limited. It was simply, did you sue your lawyers, and then later, was that lawsuit dismissed? The comments made during closing were merely inferences made from the evidence that was in evidence, and I'll also note that Cam didn't object to those statements at the time they were made. CSC was simply drawing inferences, which is allowed to do during closing argument. Let's talk about joint authorship here and the instruction. It seems like it is somewhat troubling that the district court included the joint authorship instruction when you did not request it below, and Cam didn't request it. So did CSC ultimately rely on a joint authorship theory? If not, why wasn't that joint authorship instruction problematic? No, the unrebutted evidence at trial was that the law firm Oric was the owner of the copyright. The lawyers at Oric testified to that effect, and there was no testimony to the contrary. So the jury didn't need to rely upon the joint authorship instruction in order to come to its conclusion. So what was CSC's theory at trial as to authorship and ownership of the copyright? It was twofold. One, that it was Oric that, well, CSC's theory was that it was Oric that owned the copyright. Not individual lawyers at Oric, just Oric. Oric, correct, and Cam indicated its intent to make the argument that individual lawyers were the owners of the work. CSC intended to rely upon a work-for-hire instruction to overcome that argument, which the trial court did not give, even though CSC requested it. But CSC's primary theory is that it was the partnership that owned the copyright in the first instance. Did you present any evidence at trial in response to the post-trial summary judgment motion showing that M and Park actually received revenue separate and apart from the revenue received by Cam GP and Cam LP? So, first, as a clarifying point, CSC's position has never been that Mr. M and Mr. Park received income separate and apart from the income generated by the entity, the Cam entities. Instead, our theory is that the Cam entities earned a certain amount of profits attributable to Cam, the infringement, a portion of which flowed through to Mr. Park and Mr. M as the sole owners and the controllers of the general partner, and also vis-a-vis their interest in the limited partner. To answer your question more directly, at trial, CSC put into evidence the financial statements of both the limited partner and the general partner, which showed Mr. M and Mr. Park's names next to dollar amounts. The jury could have reasonably assumed, and CSC has argued, that a reasonable inference from their names next to dollar amounts is that those dollar amounts are attributable to them. Once CSC put those documents into evidence, it was incumbent upon Cam at that point during trial to clarify what those documents mean if they thought they were susceptible to confusion. So I wanted to ask, based on the evidence that you presented at trial, I'm just trying to figure out, was there any way for the jury to distinguish between Cam's profits and the individual defendant's profits? Yes. I mean, other than what I just mentioned, there were portions in the financial statements of both the LP and the GP which designate certain dollar amounts from within the entity's profits that were designated and held separately for the individuals. Additionally, Mr. Park testified that the investors in the LP gave to him 20 percent of their profits in the form of carried interest. So those are the two pieces of evidence that we rely upon, the financial statements with their names next to dollar amounts, and the testimony from Mr. Park. In terms of the representation of their financial statements, they should have clarified that at trial and not here on appeal, which they didn't do. They spent no time explaining their financial statements. They're clearly in a better position to be understanding what those financial statements mean. And a final point on this issue, Cam has cited no case law that says that a copyright defendant must receive their ill-gotten profits cash in hand in order to be discouraged of those profits. And we've cited two cases in the context of architecture, where architectural plans were infringed, and the court found that it could discourage the profits in the form of the equity in the infringing house. And this is no different. Here, CST is simply looking for the individual defendants to be discouraged. Are those Ninth Circuit cases? No. They were not. Okay. So just so I understand your position, are you saying that you presented evidence that the individual defendants actually received distributions of cash to them separately and apart from the entities? That they individually received cash? We don't actually know whether they received cash. The evidence that we have, which was produced to us during discovery, which we put on at trial, has their names next to dollar amounts. And we think a reasonable inference from that is that this is the profits they've earned. Well, but what if they were never distributed to them yet? We don't think that makes much of a difference here. Because to hold to the contrary would allow a copyright infringer to essentially hold all of its ill-gotten gains in a shell company, then wait for the trial to be finished, and then distribute. But you got the profits from the entities. So why doesn't that make you whole? The jury found that, as a whole, all the defendants were liable for $1.7 million. And that's what the jury determined would make us whole. The trial court later granted a motion for remitter, reducing that to $1.2. We don't believe the $1.2 makes us whole because we believe the jury found, and the jury did find, according to the verdict form, $1.7 million of the defendants as a whole. Their profits were attributable to the infringement, and under the district court's ruling, we're only getting $1.2 of that. I'm just not totally following the last point you made. The $1.2 million was 100% of the net profits, yes? No. Why do you say no? There were no questions on the jury form which explained what that number was supposed to represent. $1.2 million, right? Correct. Where are they getting that number? It's not for me to speculate where they're getting that number. Well, wasn't there evidence in the record using that number? There was some evidence in the record using that number, yes. So does it not follow from common sense that that's where they're getting it? That's speculation to assume that what that number is intended to represent is 100% of the profits during the time that the defendants were using the form. And in fact, the jury verdict implies the exact opposite, that the jury found that it was actually more than that $1.17 that was attributable to the infringement. So to assign that specific number as 100% of the profits I think is inaccurate. It's speculation into why the jury chose the number that it did, which is not the province of CAM or the trial court. So remind me where that figure comes up in the evidence. I remember the trial court specific number, but I don't remember the ER site. I think it's ER 1630. And wasn't it to the effect that this was the figure of CAM's 1630? Of the two CAM entities, net profits during the infringement period as reflected in an exhibit that was admitted at that page. And so you're saying it's speculative to infer that the jury picked that figure to the dollar from something other than the exhibit? Maybe a Ouija board? I mean, how can it be anything other than they took it directly from that exhibit? How they got that number is, you know, it does look awfully suspicious. But it is speculative to assume that what that number was intended to represent in the context of the jury verdict, that it was intended to represent 100% of the profits earned by the CAM entity. During the time of the infringement. And the reason that that is speculation is because the overall jury verdict suggests a causal nexus between profits earned by the CAM entities after the infringement. But the problem is that it was a partnership. And so the partnership is specifically for limited liability purposes. And without some showing that the money from the partnership was actually distributed to the CAM entities. If it was distributed to the partners, how can they be held liable for a partnership liability? This is not a case where we're attempting to hold the owners liable for the partnership's liability. Both of the owners were found individually, directly, contributorily, vicariously liable. But in terms of damages, in terms of discouragement, if you can't show the flow from the partnership to the partners, how can you establish that they should be held liable for a partnership liability? How can they be held liable for additional damages in addition to the partnership? That's the problem. You know, there are forms that exist to show distribution to partners. And those weren't in the record. What was in record was the financial statements which had the dollar amounts that were attributed to those individual defendants right next to their names. That doesn't track distributions. That's just showing how much they may or may not be entitled to at some given point in time. But that's not an indication of what was actually distributed to those partners individually. And in the scenario where you paint as what would happen if we affirm on that issue that they put the money in the hands of the partners, put the money into a shell company and then distributed it after the fact, I mean, the basic rules of judgment, of collection of judgments and being able to pierce through that kind of thing is standard in virtually every jurisdiction that I'm familiar with. Because people always play tricks to try to avoid paying on a judgment. And that's why there's ample discovery and ample ways to deal with that. And if I'm understanding your point correctly, I believe that actually supports our point, which is that the jury found that these individual defendants profited. The fact that it wasn't cash in their pocket shouldn't bar CSC from collecting on that recovery. That's a different point. But my point is that the scenario you were raising was, oh, if there's no distribution to the partners and we say, therefore, they're not entitled, the plaintiff is not entitled to anything, then this will open this great loophole because after the judgment is rendered, what will happen is that they'll put the money in a shell, I think you said, and then make a distribution. But I don't see how that avoids the normal post-judgment enforcement inquiries. I think the hypothetical I was describing was a little different, which was that this will allow people to commit copyright infringement through LLCs or LPs. Or what have you. And in this case, the jury... That's, forgive me for interrupting, is that what limited liability is all about? I mean, you know, last I heard that even before a corporation was determined to be a person, it was determined to have limited liability. And that's not incorrect. But the copyright law is clear that if the individual owners are directly liable for copyright infringement, they can be disgorged of their ill-gotten profits. Of what they got. In addition... And by remitting that, they are able to disperse the profits from the two entities at any time without having to be disgorged of their ill-gotten gains. I'm out of time. All right, counsel. Thank you. Two minutes for rebuttal. Thank you, Your Honor. I know it's a long day for you. Very quickly, to hit the points that were made. Number one, with respect to the concept that the general counsel acted as the staple among the documents, what about the best evidence rule? How hard would it have been for them if, in fact, the 2012 financing agreements included the 2012 avance to simply show the documents? It was never showed. More importantly, you go back to the assignment. We put Schedule I, again, ER 1586. All they assigned was the 2013 form. They did not, there is no assignment. There is no ownership of the very document that was at the heart of the entire case. I believe I don't have to give you much on, with respect to the damages. We laid it out in our brief. The one thing was if they were going to put on evidence a bank account, tax return, a K-1, anything showing that the individuals actually got disbursements. And what we showed through the financials was, in fact, that wasn't a deduction. That was, they basically, we showed through our brief that none of that ties into any profits. 100% of the profits from the GP, the general partnership, and the LP, that was awarded. Again, I disagree when we're talking about a form after the fact. I understand about the leeway of the jury. I just want to leave you with this. I think that this case, from my perspective, again, where the train jumped the track is that the district court, and rightfully so, when they came in and sought injunctive relief and saw that someone was using someone else's form, the district court was upset. But the point is, is that what the case was tried on was simply a copyright case. And I think we've shown through our brief, between the ownership, Curtin-McConkie, sweat of the brow, all of these things, that my clients did not get what should have been a fair trial for copyright. Thank you. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. That completes our calendar for the morning. We will recess until 9.30 a.m. tomorrow morning.
judges: Rawlinson, Murguia, Rakoff